In the Matter of Acquiring Title by the City of New York to Certain Lands and Premises Situated on the Northerly Side of West Two Hundred and Fifth Street, etc., Duly Selected as a Site for a Housing Station for the Street Cleaning Department of the City of New York, According to Law.

Northern Terminal Corporation of New York, Appellant, Respondent; The City of New York, Respondent, Appellant.

First Department, November 28, 1924.

Condemnation — proceedings by city of New York to condemn land bordering on Harlem river — riparian rights — claimant's predecessor in title made agreement with city fixing arbitrary boundary line on river side of property — plaintiff's predecessor agreed to convey to city all land beyond boundary including riparian rights — reciprocal deeds were executed — agreement and deeds destroyed riparian rights — plaintiff is not entitled to damages on basis of riparian rights — doubtful whether plaintiff's predecessor ever had riparian rights — Greater New York charter, § 71, forbids city to sell land under water but § 205 thereof permits city to exchange lands.

The claimant, in proceedings instituted by the city of New York to condemn land bordering the Harlem river, is not entitled to damages on the basis of riparian rights, since it is doubtful whether or not the claimant's predecessor in title ever had any riparian rights under the Dongan charter, and for the further reason that if plaintiff's predecessor had riparian rights in the Harlem river, those rights were destroyed by an agreement between the plaintiff's predecessor and the city of New York, whereby the boundary line on the river side of the land in question was arbitrarily fixed without regard to the actual high-water line, and the plaintiff's predecessor agreed to transfer to the city of New York all land lying easterly of the line so fixed " together with all riparian rights incident thereto," which agreement was carried out by the execution of reciprocal deeds on the part of the plaintiff's predecessor and the city of New York.

The agreement between the plaintiff's predecessor and the city of New York is valid, for, while the city is forbidden by section 71 of the Greater New York charter to sell any of its land under water, still it has express authority under section 205 of the charter to exchange its interests in lands and lands under water for the upland proprietor's interest in lands and lands under water.

Dowling and McAvoy, JJ., dissent, with opinion.

Cross-appeals by the claimant, Northern Terminal Corporation of New York, and by the petitioner, The City of New York, from a final order in condemnation proceedings of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 19th day of February, 1924, declaring just the compensation awarded by a tentative decree

3

**34** MATTER OF CITY OF N. Y. (WEST TWO HUNDRED & FIFTH ST.).

First Department, November, 1924. [Vol. 211

to owners of the respective damage parcels acquired by the city of New York.

*Malcolm R. Lawrence* [*Charles J. Nehrbas* of counsel], for the claimant, Northern Terminal Corporation.

*George P. Nicholson, Corporation Counsel* [*John F. O'Brien* of counsel; *Josiah A. Stover* with him on the brief], for the City of New York.

MERRELL, J.:

Cross-appeals have been taken from a final decree in condemnation proceedings instituted by the city of New York to acquire certain lands and property of the Northern Terminal Corporation of New York situate east of Ninth avenue and between Two Hundred and Fifth and Two Hundred and Sixth streets in the borough of Manhattan, New York city. The land in question which the city has condemned consists of 29,975 square feet, approximately twelve lots, and is desired for the use of said city and its street cleaning department for sewage disposal. A tentative decree was made by the court fixing the damages of the claimant by reason of the appropriation by the city of its said lands at $52,800. Objections thereto were filed which were overruled by the final decree appealed from, and said damages were finally awarded at the sum mentioned. The claimant, Northern Terminal Corporation of New York, appeals from said final decree, contending that the award of damages in its favor disregarded its right as a riparian owner, claiming that its lands lay along the westerly boundary of the Harlem river, and that said claimant was the owner of valuable riparian rights in connection with the property appropriated by the city, and that no allowance was made in the award of damages in compensation of such riparian rights. The city, on the other hand, appeals from the final decree upon the ground that the award in claimant's favor was excessive. The city, however, contends upon this appeal that the claimant was not the owner of riparian rights of value and never owned any such rights, and that whatever rights of negligible value may have been owned in connection with the lands appropriated were divested and conveyed to the city by one Butterly, claimant's predecessor in title. Assuming the correctness of the city's position, and that the claimant possesses no riparian rights, then the claimant has not suffered as the result of the damages allowed, as such damages were clearly granted by the court upon the testimony of the claimant's chief witness on valuation, Hotaling, who testified that aside from riparian rights, the lots in question, twelve in

number, which the city appropriated, were worth $4,000 per lot, plus a plotage value of ten per cent, making in all $52,800.

The main question presented upon this appeal is as to whether the claimant, at the time of the taking of its property, was the owner of riparian rights of value in connection therewith.

The parcel of land taken by the city in these proceedings, as described in the petition herein, is bounded on the east by the high-water line of the Harlem river, " as fixed, determined upon and established and duly approved by the Commissioners of the Sinking Fund of the City of New York by resolution adopted October 19, 1916." The claimant is in error in stating that the land fronts on the river. The line as fixed, determined upon and established by the commissioners of the sinking fund of the city of New York on October 19, 1916, was a straight, arbitrary and purely imaginary line disassociated entirely with the physical location of the actual high-water line between Two Hundred and Fifth and Two Hundred and Sixth streets. This imaginary line was first fixed by the dock commissioner and approved by the commissioners of the sinking fund after James N. Butterly, then owning the property, and the city of New York had entered into an agreement on July 27, 1916, pursuant to section 818-a of the Greater New York charter (Laws of 1901, chap. 466, as added by Laws of 1911, chap. 694),* concerning the establishment of said line, and as permitted by section 205 of said charter (as amd. by Laws of 1911, chap. 694, and Laws of 1913, chap. 259), concerning the approval of such establishment of line and the conveyance and exchange of lands under water. The agreement between Butterly and the city was with reference to the fixing of an imaginary line as the high-water line of the Harlem river running from Two Hundred and Second to Two Hundred and Sixth streets, excepting, of course, that portion occupied by public streets. The agreement between Butterly and the city recited that Butterly owned the property west of the high-water line " as shown on the tax maps," and that the city was the owner of the property east of said line and west of the pierhead and bulkhead line established by the Secretary of War October 18, 1890. Butterly, in said agreement, agreed to convey to the city all his interest in that portion of the lands owned by him east of a line 250 feet east of Ninth avenue which was fixed as the high-water line, " *together with all riparian rights incident thereto.*" The city on its part agreed to convey to Butterly all its interest to that portion of the lands under water west of said line fixed as the line of high water. This agreement was approved October 19, 1916, by the sinking fund commissioners,

---

* Since amd. by Laws of 1918, chap. 537, and Laws of 1919, chap. 330.—[Rep.

First Department, November, 1924.            [Vol. 211

and on the same day said commissioners adopted the high-water line as thus agreed upon between the owner and the city. Thereafter and on March 10, 1917, a reciprocal deed was executed by Butterly and the city wherein they covenanted that the line of high water, as so adopted and approved, should constitute the boundary between their respective lands and premises. The city released to Butterly all its interest in the land and land under water west of the high-water line as thus fixed, and Butterly released to the city all his interest in the land and land under water east of said line " *together with the appurtenances and all the estate and rights of the said party of the second part* in and to said premises."

Aside from said agreement and covenants, which would seem to have entirely destroyed the riparian rights of the plaintiff's predecessor in title in connection with said lands, it is very doubtful whether under the Dongan charter and adjudicated cases Butterly ever had any riparian rights of material value in connection with said lands. Under and by virtue of said charter and the authorities, the tideway in connection with said waterfront and incidental riparian rights were vested in the city. It would seem, therefore, that the claimant's land was completely shut off from the Harlem river by upland, and that the riparian rights incident thereto were owned by the city. The award of $52,800 was made by the trial court after viewing the property, and as stated in the very brief opinion rendered in connection with the granting of said final decree, the court allowed no compensation to the claimant for riparian rights.

It is the contention of the city that the owner of the upland along the west bank of the Harlem river held title only to high-water mark, and that the tideway or strip of land between high- and low-water mark was granted to the city by the provisions of the Dongan charter, and that the State, as successor to the Crown, was vested with title to the land under water outshore low-water mark, but that the State had granted whatever rights it possessed in trust to the city for purposes of navigation and commerce. (Laws of 1852, chap. 285; Grant of July 6, 1871; *Sage* v. *Mayor*, 154 N. Y. 61.) In *Matter of City of New York* (168 N. Y. 134) the court said (at p. 143): " While he does not own the tideway, or the lands under water beyond the same, he has the easement of passage and the transportation of merchandise, to and fro, between the navigable water and his land; to fish and draw nets; to land boats and to load and unload the same. These privileges are absolute property rights as against all but the State. The State holds the title in fee in the tideway and to the lands under water beyond the same, as trustees for the public

in its organized capacity. As such trustee and in the exercise of its governmental functions it may improve the tideway or the adjacent waters for the benefit of navigation, even to the detriment of abutting upland owners and without compensation to them.''

While section 71 of the Greater New York charter (Laws of 1901, chap. 466) forbids the alienation by the city of any of its lands under water, by the provisions of section 205 of the charter, as amended by chapter 694 of the Laws of 1911 and chapter 259 of the Laws of 1913, the city is empowered to *exchange* its interest in lands and lands under water for the upland proprietor's interest in lands and lands under water. This was what was done by the agreement between Butterly and the city of July 27, 1916. It would not seem that Butterly at any time prior to the making of such agreement and the execution of such deed had any stronger riparian rights than did the owner of the lands involved in *Matter of City of New York* (168 N. Y. 134). In that case the rights of the owner were defined as follows: " The city of New York, as successor to the rights of the Crown, has ' the absolute power to improve the water front for the benefit of navigation, free from any interference by the riparian owner, whose sole right as against the State or its municipal grantee, as trustee for the public, is the presumptive right to purchase, in case of a sale, when conferred by statute.' * * * The appellant herein, while conceding the right of the State or municipality to make improvements for the benefit of navigation, without compensation to riparian proprietors for invasion of their private rights, contends that the construction of a ' speedway,' * * * is not an exercise of that right. * * * If these changed conditions are the result of improvements to general navigation, then, as we have seen, the injured upland owner is remediless, for it was simply the exercise by the State of its reserved and paramount power over its tideways and tidewaters. * * * ''

Butterly had no authority or right to erect any structure or make any fill below high-water mark. Undoubtedly, before alienating the same, he had the right of passage to and fro between navigable water and his land, and to fish and draw nets, and to land boats and to load and unload the same. He certainly had no such rights as are contemplated and claimed by the claimant herein and upon which claimant's witnesses based testimony valuing the property as high as $190,000. . His rights were largely theoretical, and in dollars and cents were negligible. At that time the river was but two feet in depth in front of the premises condemned.

**38** MATTER OF CITY OF N. Y. (WEST TWO HUNDRED & FIFTH ST.).

First Department, November, 1924.                    [Vol. 211

It is the contention of the claimant, appellant, that the effect of the Butterly agreement and the reciprocal deed between himself and the city was merely to change the location of the high-water line and did not extinguish the owner's riparian rights. This claim is overcome by the plain provisions of the agreement and deed showing that it was the intention of the parties to destroy all riparian rights of the owner of the land. The conveyance under date of March 10, 1917, which fixed the artificial high-water line, was that such line " shall be and remain the boundary line between the land and premises belonging to the City of New York and the land and premises belonging to the parties hereto of the second part." Such contention of the claimant entirely ignores the provision contained in the agreement between Butterly and the city that such conveyance was to be made " *together with all riparian rights incident thereto,* in exchange for the conveyance by the City of New York." Under such circumstances I do not believe that Butterly retained any riparian rights in connection with the lands conveyed, and if so, the land condemned was entirely cut off from connection with the Harlem river.

The final decree appealed from should be affirmed, without costs to either party as against the other.

CLARKE, P. J., and SMITH, J., concur; DOWLING and McAVOY, JJ., dissent.

DOWLING, J. (dissenting):

The learned court at Special Term announced in its opinion that " No compensation has been awarded for riparian rights." If, therefore, the claimant had any riparian rights, the decree must be reversed and the matter remitted to the Special Term in order that an appropriate award may be made for such rights as part of the compensation to be awarded for the land condemned.

I am unable to agree with the conclusion reached by the majority of the court as to the force and effect to be given to the agreement between Butterly and the city of New York and to the deeds of exchange executed thereunder. The sole effect of these documents, as I view them, was to merely change the location of the high-water line. Butterly owned four blocks of upland fronting on the high-water line of the Harlem river, with the usual riparian rights. By the agreement which he made with the city, Butterly, who owned to the natural high-water line, agreed to the substitution of an artificial line for such natural line. When he conveyed to the city the land to the east of that line, he conveyed land under water. The riparian rights which he conveyed were

" all riparian rights incident thereto," that is, to the land thus conveyed, which was land under water.

Butterly remained the owner of the shore line. He owned to the agreed artificial high-water line and never released any of his rights appurtenant to his ownership of the west shore down to such line.

The city itself recognized the claimant's title as riparian owner for by the application made by it to condemn the land owned by claimant, in this proceeding, the land was described as running, as to two of its boundaries: " thence easterly along the southerly side of 206th Street one hundred and fifty (150) feet to the high-water line of the Harlem River, as fixed, determined upon and established and duly approved by the Commissioners of the Sinking Fund of The City of New York by resolution adopted October 19, 1916; thence southerly along said high-water line to the northerly line of West 205th Street."

Being the owner to the high-water line, and the only owner of the upland, claimant as successor in title to Butterly, in my opinion had, as riparian owner, the following rights: " He has the right of access to the channel or the navigable part of the river for navigation, fishing and such other uses as commonly belong to riparian ownership, the right to make a landing wharf or pier, for his own use, or for that of the public, with the right of passage to and from the same with reasonable safety and convenience. A pier may be constructed without a grant from the State of the land under water upon which it rests. In this country it has generally been held that the upland owner has the right of constructing a proper pier, or landing, for the use of himself and the public, subject to the general regulations prescribed by the State or the United States. What form or shape or size the pier may take varies with use and necessity. The upland owner has no right to fill in the land under water for purposes foreign to commerce and navigation."

Further, the owner has " the right to wharf or pier out to the navigable part " of the Harlem river. " They could build piers which would rest upon the land under water, or they could build wharves and erect bulkheads. They also could fill in marshy ground and erect a substantial wharf for the use of navigation and commerce connected with their business. (*People* v. *Mould,* 37 App. Div. 35.) All these things could be done under the implied permission of the people of the State of New York by reason of the law pertaining to upland owners, *i. e.,* the law of riparian rights."

These rights of an upland owner are defined as above in *Hinkley* v. *State of New York* (234 N. Y. 309).

Furthermore, I believe that the rights of the riparian owner are not limited to the bulkhead line established by the city of New York, but extend to the bulkhead line approved by the Secretary of War. (*Appleby* v. *City of New York*, 235 N. Y. 351; *Matter of Appleby* v. *Delaney*, Id. 364.)

If the claimant as riparian owner has the rights heretofore enumerated, it is clear that they are of value and that an award should have been made therefor.

I, therefore, dissent from the affirmance of this decree, in so far as it is appealed from by the claimant.

McAvoy, J., concurs.

Decree affirmed, without costs.